In re NORTH AMERICAN LIGHT & POWER CO. et al.

Civ. A. No. 1033.

United States District Court
D. Delaware.

Dec. 3, 1951.

932

Myron S. Isaacs, Chief Counsel, Division of Public Utilities, and Frank Field, Attorney, both of Washington, D.C., for Securities and Exchange Commission.

E. Ennalls Berl (of Berl, Potter & Anderson), of Wilmington, Del., for James F. Masterson.

H. S. French (of French & Biscoe), of Washington, D.C., for Lewis M. Dabney, Jr.

LEAHY, Chief Judge.

The original litigation, here, started as an enforcement proceeding under § 11(e) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79k(e). The Securities and Exchange Commission's first petition was to that part of Plan I calling for the settlement of inter-company claims vis-a-vis The North American Company,[1] North American Light & Power Company,[2] and Illinois Power Company.[3] That portion of the Plan was approved by order on May 28, 1947. Later, the SEC sought enforcement of Amended Plan I which looked to liquidation of Light & Power and distribution of assets to its security holders. By

1. Here called "North American".
2. Id.   "Light & Power".

3. Id.   "Illinois Power".

order of November 6, 1947, this, too, was approved.[4]

Then, various applications were filed with the SEC for attorneys' fees and allowances. The Commission heard the applicants and on December 21, 1950, found many of the requests substantially within the range of reason, in the aggregate—$2,207,650 and $141,461. After the allowances, action was, however, deferred as to the applications of A. A. and J. Wallace, I. Steinman, I. S. Friedman and the protagonists here, James F. Masterson and L. M. Dabney. The former sought a $10,000 fee in addition to the $21,975 and expenses of $615.47 allowed by the SEC on December 21, 1950, and the latter sought a fee of $7500 and expenses of $107.22. The applications upon which deferred action had been taken, after another opportunity for argument was had, were again rejected by the SEC on June 1, 1951. The parties requested court review of their applications. The SEC filed Supplemental Application No. 2 praying the requests for fees and expenses be not charged against any of the subject companies. A date for hearing was fixed. All applicants, except Masterson and Dabney, retreated. The Masterson-Dabney claims for additional compensation are, now, for consideration on the SEC's Supplemental Application No. 2.

## Masterson

1. The SEC stands behind the bastion that if its findings on fees are supported "by substantial evidence" and were "arrived at in accordance with legal standards" I should approve its action. The SEC marshalls for its main proposition its own autonomy, i. e., Engineers Public Service Company, —— S.E.C. ——, 1946, Holding Company Act Release No. 7041. See, too, In re Engineers Public Service Co., D.C.Del., 71 F.Supp. 797, affirmed in part, In re Engineers Public Service Co., 3 Cir., 168 F.2d 722; and,

finally, the plan approved, in Securities and Exchange Commission v. Central-Illinois Corp., 338 U.S. 96, 69 S.Ct. 1377, 93 L.Ed. 1836, per Mr. Justice Rutledge and unanimous Court.

■ In the Engineers case, the SEC wrote: "Although Section 11(e) contains no specific provision covering the allowance of fees and expenses, it has been our consistent practice over a long period of time to exercise jurisdiction over fees and expenses in Section 11(e) plans. This is the first case in which substantial question has been raised as to our power in this respect. * * * The payment of fees and allowances to such persons from the estate, *under court supervision,*[5] is an accepted principle of equity receivership and corporate reorganization law. In exercising jurisdiction over fees and expenses we have endeavored to assure adequate compensation to qualified representatives of the various groups of security holders and thereby to assure adequate coverage of the issues before us." The cases, infra, show, for example, the SEC in Chapter X, 11 U.S.C.A. § 501 et seq., proceedings in bankruptcy does act in an "advisory capacity" in fee and allowance recommendations. Though the District Court judge still must exercise his independent judgment, the SEC recommendations are "entitled to weight as representing the expert opinion of a wholly disinterested agency skilled and experienced in reorganization affairs." 6 Collier on Bankruptcy (14th ed., Moore and Oglebay), at p. 4498. In the light of Securities and Exchange Commission v. Central-Illinois Corp., supra, query whether "independent judgment" approaches the stature of even a modicum of review power. Obviously, there is no specific statutory authorization to the SEC in Chapter X proceedings to set fees. Likewise, in § 11(e) proceedings of the Public Utility Holding Company Act the SEC has

4. See, In re Illinois Power Co., D.C.Del., 74 F.Supp. 317, affirmed In re North American Light & Power Co., 3 Cir., 170 F.2d 924. See, too, In re Illinois Power Co., D.C., 84 F.Supp. 342, affirmed Appeal of North American Light & Power Co., 3 Cir., 180 F.2d 975.

5. Emphasis added to show: Although this phrase was written before the final pro-

nouncement of the Supreme Court in the Engineers case, Securities and Exchange Commission v. Central-Illinois Corp., 338 U.S. 96, 69 S.Ct. 1377, 93 L.Ed. 1836, it discloses the SEC considered District Judges under § 11(e) proceedings were not without power to reverse a finding of the Commission on a fee question.

no legislative imprimatur to set fees. In a § 11(f) proceeding under the Public Utility Holding Company Act, the SEC, however, has expressly been given the power to set fees and allowances. It is asserted, however, in the leading text in the field, that the principles of § 11(f) should be applicable in a Chapter X proceeding, where, as I have said, there is no statutory authority to set fees given the SEC and even though Chapter X was passed after the Holding Company Act. 6 Collier on Bankruptcy, supra, at p. 4498, fn. 14. The justification for applying the specific warrant of § 11(f) to Chapter X is "well established principles of statutory interpretation, as well as considerations of sound public policy." Ibid.

In its brief in the matter at bar the SEC relies upon Chapter X "authority" for its setting fees. It would seem, therefore, the reliance upon authority at this point has made a complete circle, i. e., the SEC in Chapter X may set fees because "sound principles" necessitate such a course, and, under § 11(f), the SEC is expressly given the power in certain circumstances, and, therefore, the SEC can set fees in § 11(e) proceedings because it does so in Chapter X. The fact remains, nonetheless, Congress has not cloaked the SEC with the fee setting mantle in either Chapter X or § 11(e) proceedings, though it has in § 11(f).

To carry the metaphor one step further, I suggest, wearing the royal raiments does not entitle the pretender to the royal prerogatives.

■ I think the SEC is aware of this because by its brief and arguments it concedes § 11(e) of the Act contains no speci-

fic provision for its supervision over allowances of fees and expenses. But, this lack of legislative grant of power, the SEC counters, is remedied because, the SEC finds, "it has been our consistent practice over a long period of time to exercise jurisdiction over fees and expenses in Section 11(e) plans." 6 This is the lifting-yourself-by-your-own-bootstraps approach. In short, while Congress did not grant such power, it appears if you exercise it over a specific vicinage long enough you have it. In support of this view the SEC says: "The Commission has consistently taken the position that an allowance of fees and expenses by the Commission, as to which there is no contest, may be paid without a further order of the District Court." I make no comment on whether this is logic *in vacuo*. The SEC admits, as I suggested before, "where a plan provides for District Court enforcement, the District Court has jurisdiction to review an allowance which the company regards as excessive or a claimant regards as inadequate." Two courts7 have subscribed to this idea, relying, in the main, on the techniques applied in considering fees and allowances under § 77B, 11 U.S.C.A. § 207, and Chapter X of the Bankruptcy Act.

■ 2. The SEC rejects Masterson on duplication of services—an idea not new. It has always been considered a relevant factor by bankruptcy courts as well as by general courts of equity in receivership or in any reorganization proceeding. Heretofore, in this category of cases, the role of the SEC, as far as I have been able to find, is merely that of an adviser to the Court. But in the matter at bar, the SEC now ar-

6. Cf. Utilities Employees Security Co., —— S.E.C. ——, 1944, Holding Company Act Release No. 4349.

7. One, to the Delaware District Court in Columbia Oil & Gasoline Corporation et al., our CA 288, on May 18, 1945; the other, in Re Electric Bond & Share Co., D.C.S.D.N.Y., 80 F.Supp. 795.

In the Delaware case of Columbia Oil & Gasoline Corp., it was simply stated (per Kirkpatrick, J. [unpublished opinion]) that "in accordance with Section 11 (f) of the Act and regulations thereunder, the applications [for fees] were referred to the Commission." The Del-

aware Court examined the findings of the Commission and found they were sustained by the evidence, and that there was no error of law.

In Re Electric Bond & Share Co., supra, Judge Knox carefully refrained from interpreting § 11(f) as authorizing the SEC to fix fees in a § 11(e) proceeding. As I suggested, supra, under § 11 (f) the power granted to the Commission to pass on fees is "in any such proceeding", i. e., a proceeding covered by § 11 (f), in contradistinction to a § 11(e) proceeding.

ticulates in a § 11(e) proceeding it acts "in a quasi-judicial capacity to decide the issues subject to Court review." Its reliance is on Finn v. Childs Co., 2 cir., 181 F.2d 431, 438. That case was in bankruptcy and the precise problem of function under a § 11(e) proceeding was not before the Court for decision. Judge Clark in that case did, however, state his view, in passing, that the Commission has a legislative grant of power "to fix a maximum amount for fees * * * with regard to the reorganization of public utility holding companies under § 11(f) of the Holding Company Act". But the obvious fact is the matter at bar does not involve a § 11(f) proceeding.

█ 3. The above discussion tells the basis of the SEC's ruling with respect to the fee claimant Masterson. Though there is much to recommend the SEC position in fixing the figures of compensation in that the SEC, having observed the work of counsel before it, is possibly better able to appraise the value of such services than the judge to whom the question of fees is sub-

mitted on review, still, the awareness of the judiciary of the worth of counsel's contribution to any particular litigation should not be ignored or underestimated. To ignore entirely the judicial cognizance of fees would, I think, be assuming a judge has never been a practicing attorney and has never had the opportunity to acquire a legal sophistication as to the value of the toilers *per diem* in matters of corporate reorganization.

Now, the apologia of the Commission for its action, here, may be found in the footnote [8], where it thought it had intimate knowledge of the "duplicative" and "secondary" character of the services under which it would be unreasonable for Masterson to be paid in excess of $100 *per diem*. In this case, the approach of the SEC ignores the vital fact—the lawyer-client relationship. Masterson's client was Light & Power. During June 1943 Light & Power sought the legal services of Masterson. He asked for $250 a day. He had never, according to the testimony, accepted less. Then, law-

8. In its Memorandum Opinion dated May 7, 1951, the Commission said the following with respect to Masterson's services:

"Masterson, a Philadelphia attorney, was associated with Clayton E. Kline, of Topeka, Kansas, as counsel for Light & Power. He has sought compensation for services in connection with the proceedings which he stated consumed 219-3/4 days. He has already been paid by Light & Power at the rate of $100 a day, a total of $21,975, plus $615.47 reimbursement of expenses, and we have released jurisdiction over these payments made to him. His application originally requested an additional fee of $21,975, but following the close of the record he and representatives of Light & Power agreed upon a payment of $10,000 in addition to the amounts heretofore paid as being mutually satisfactory, subject to this Commission's approval.

"Masterson was retained by Kline to assist him and to act as local counsel for Light & Power in proceedings before us and the courts in Philadelphia and Wilmington, Delaware. When both were present at hearings, which was often, Kline conducted practically all the examination of witnesses. During many of the hearings at which Masterson was present without Kline he did not take an active part. In the numerous hearings devoted

to the development of claims and claimsover on behalf of Light & Power against North American, the burden of establishing the claims was carried by Lawrence R. Condon as counsel for certain preferred stockholders of Light & Power over the objections of Kline and Masterson as representatives of the management of Light & Power. In these hearings Kline and Masterson were almost completely inactive, limiting themselves to routine objections to certain evidence. As Masterson expressed it, the services 'consisted primarily in being there.'

"Masterson worked on various applications, motions and briefs, interviewed witnesses in preparation for trial and consulted with Kline as to trial methods, and attended numerous hearings and conferences. We have recognized his contribution by approving the payment to him of $21,975. However, Masterson was subordinate to Kline, who has received a substantial allowance, and his services duplicated those of Kline to a considerable extent and were to a degree unproductive.

"Upon a consideration of the record, we conclude that it does not support Masterson's contention that he is entitled to receive additional compensation, and his request therefor will be denied."

yer-client negotiation commenced. They agreed he would get $100 a day plus an additional sum to be awarded him at the close of the proceedings before the SEC. Subsequent to the close of the record on fees before the SEC, but before the Commission had passed on the question of allowances, Masterson notified the Commission he and his client had *mutually agreed* [9] he should receive the additional sum—$150 *per diem* instead of the $100 *per diem* he had already been allowed by the SEC. The SEC ignored this information for it thought Clayton E. Kline, Esq., of Topeka, Kansas, was primary counsel for Light & Power and Masterson's services for that company were merely "duplicative". Kline seems to reject this idea. His support for the agreement that Masterson should receive $150 a day instead of the $100 "allowed" by the SEC, is that this litigation involved tremendous amounts of money; and, due to the complexity of the legal proceedings and the long tenure of the litigation, it was to the best interest of Light & Power that it be represented by more than one attorney. Both Masterson and Kline, the record discloses, worked in "close harmony".

The services of an attorney—interviewing witnesses, getting evidence, doing research, planning strategy—may be highly complementary, even though "duplicative". In my experience at the bar and on the bench, I have observed lawyers of great talent simply sitting at the counsel table and not, apparently, engaging in the combat of litigation, yet obviously their contribution to the matter for determination, whether before an administrative agency or a court, is not without professional significance. And, their contributive worth to the legal drama cannot be ignored or brushed aside by the semantics of such loose words as "duplicative" and "unproductive".

■ Here, facts show Masterson's $100 *per diem*—the precise amount allowed by the SEC—would not be sufficient to cover his routine office expenses. He wanted $250 per day. He compromised with Kline. The Board of Directors of Light & Power approved the $150 rate and this, too, was recommended by counsel for North American. Every party in interest, except the SEC, thought the rate was a reasonable attorney's fee. This is plain: Light & Power made an agreement with Masterson; he performed his professional services in reliance on it. Regardless of what effect should be given to the administrative fiat in the case at bar, or what power there may remain in a District Court under a § 11(e) proceeding to review fees and allowances made by the SEC,[10] the facts of *this case* show an agreement was reached between lawyer and client; and simple equitable doctrine requires that, after an examination of Masterson's services, the client be permitted to pay him what it thought and thinks is a reasonable and adequate fee of $150, and not the $100 *per diem* the Commission has announced is sufficient; otherwise the management of a subject company is impotent to agree on lawyers' fees if it be against the pleasure of the SEC. The avowed paternalism of the Commission for security holders, under such circumstances, can have no arrival "in accordance with legal standards" even under the thesis of the Engineers case.

### Dabney

■ 4. So far, I have sedulously refrained from deciding the definitive spheres

---

9. I know of many instances where in reorganization proceedings before the District Court an applicant for a fee and the SEC would agree on what is a proper figure—or, in other instances, a figure would be arrived at as to which the SEC would raise no objection.

10. In Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, at pages 489–490, 71 S.Ct. 456, 465, 95 L.Ed. 456, per Mr. Justice Frankfurter, it was said:

"Since the precise way in which courts interfere with agency findings cannot be imprisoned within any form of words, new formulas attempting to rephrase the old are not likely to be more helpful than the old. There are no talismanic words that can avoid the process of judgment. The difficulty is that we cannot escape, in relation to this problem, the use of undefined defining terms. * * * Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function."

of legal power, on the question of fees, between an administrative agency of the Government which alleges it acts, in this specific connection, 'in a quasi-judicial capacity" and the orthodox functions of a District Court in matters of corporate reorganization and liquidation. As I look at Dabney's claim, I am not concerned with the question of an agreement made between lawyer and client, as in the Masterson situation; but I must, as to Dabney's claim, meet the question posed as to the autonomy of the SEC vis-a-vis the District Judge in such a fee situation. I bow to the pontification of the Engineers case,[11] insofar as it utilizes the doctrine "of substantial evidence" in contradistinction to the SEC's "quasi-judicial" determinations of what are "legal standards" to narrow the review function of a § 11(e) judge; and I intend to keep in mind the admonition against surrender of all judicial review as announced in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 450.

5. Dabney did not appear, in these proceedings, before the SEC or this court, to propose any steps in the plans which were finally adopted by court approval. He did, in fact, propose a plan to the Commission that stock of Union Electric Company of Missouri owned by North American should be distributed; but that plan looked to no settlement of claims in litigation between the various subject companies. Dabney assumes that *his plan,* in some inarticulate fashion, forced the settlement of the conflicting claims. There is no evidence to support this position. The urgency of his claim is based upon pure conjecture.[12] His theory for compensation is highly tenuous on both a factual and legal basis.

### Conclusion

I have concluded to grant the SEC's Supplemental Application No. 2, except as to the Masterson claim for additional fee which, I think, should be allowed. An order may be submitted in accordance with the foregoing.

11. Securities and Exchange Commission v. Central-Illinois Corp., 338 U.S. 96, 69 S.Ct. 1377, 93 L.Ed. 1836.

12. The record concerning negotiations for the settlement of inter-company claims which finally resulted in a compromise shows no consideration was given to the "Dabney Plan". The North American Company, —— S.E.C. ——, Holding Company Act Release No. 7375, pp. 23–4.